# 14-3348

## U.S. Court of Appeals for the Second Circuit

————————————

AMERICAN TRUCKING ASSOCIATIONS, INC.,
WADHAMS ENTERPRISES, INC.,
LIGHTNING EXPRESS DELIVERY SERVICE INC.,
WARD TRANSPORT & LOGISTICS CORP.,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*(caption continued on inside cover)*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS AMERICAN TRUCKING
ASSOCIATIONS, INC., WADHAMS ENTERPRISES, INC., LIGHTNING
EXPRESS DELIVERY SERVICE INC., AND WARD TRANSPORT &
LOGISTICS CORP.**

Richard Pianka
  ATA LITIGATION CENTER
  950 North Glebe Road
  Arlington, VA 22203
  (703) 838-1889

Evan M. Tager
Richard B. Katskee
Thomas P. Wolf
  MAYER BROWN LLP
  1999 K Street NW
  Washington, D.C. 20006
  (202) 263-3000

*Attorneys for Plaintiffs-Appellants*

v.

NEW YORK STATE THRUWAY AUTHORITY, NEW YORK STATE CANAL
CORPORATION, THOMAS J. MADISON, JR., in his official capacity as
Executive Director of the New York State Thruway Authority, HOWARD
MILSTEIN, in his official capacity as Chair of the New York State Thruway
Authority/Canal Corporation Boards of Directors, DONNA J. LUH, in her
official capacity as Vice-Chair of New York State Thruway
Authority/Canal Corporation Boards of Directors, E. VIRGIL CONWAY, in
their official capacities as members of the New York State Thruway
Authority/Canal Corporation Board of Directors, RICHARD N. SIMBERG, in
their official capacities as members of the New York State Thruway
Authority/Canal Corporation Board of Directors, BRANDON R. SALL, in
their official capacities as members of the New York State Thruway
Authority/Canal Corporation Board of Directors, J. RICE DONALD, JR., in
their official capacities as members of the New York State Thruway
Authority/Canal Corporation Board of Directors, JOSE HOLGUIN-VERAS, in
their official capacities as members of the New York State Thruway
Authority/Canal Corporation Board of Directors,

*Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

American Trucking Associations, Inc., is a national trade association. It has no corporate parents, affiliates, or subsidiaries, and no publicly held corporation owns ten percent or more of its stock.

Wadhams Enterprises, Inc., Lightning Express Delivery Service Inc., and Ward Transport & Logistics Corp. are privately held companies. None has any corporate parents, affiliates, or subsidiaries, and no publicly held corporation owns ten percent or more of the stock of any of them.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ......................................................... i

Table of Authorities ....................................................................... iv

Introduction ................................................................................... 1

Jurisdictional Statement ................................................................. 2

Issues Presented ............................................................................ 3

Statement of the Case .................................................................... 3

    A. The Thruway Authority, The Roads, And The New York
       Canal System. ...................................................................... 4

    B. The Thruway Authority's Collection And Use Of Toll
       Revenues. ............................................................................ 9

    C. The Proceedings Below. ....................................................... 10

Summary of the Argument ............................................................. 13

Argument ...................................................................................... 16

I. New York Is Not An Indispensable Party Under Rule 19. ......... 16

    A. The District Court's Rule 19 Determination Is
       Irreconcilable With Controlling Second Circuit
       Precedent. ............................................................................ 17

    B. A Verdict In ATA's Favor Would Not Implicate, Much
       Less Interfere With, The State's Obligation Not To
       Abandon The Barge Canal. .................................................. 23

        1. The term "abandon" in Article XV, Section 1,
           refers to relinquishment of a property right in the
           barge canal, not to expenditures on economic-
           development projects. ................................................... 24

        2. The decision below engrafts onto Article XV
           financial obligations for the state that the
           Legislature never intended. ....................................... 30

    C. The Decision Below Misconstrues The Interest
       Requirement Of Rule 19. ...................................................... 35

II. This Action Was Timely. ............................................................ 38

    A. The Statute Of Limitations Does Not Bar Suit ..................... 39

**TABLE OF CONTENTS—continued**

**Page**

B. The Doctrine Of Laches Does Not Apply. ........................................... 42

Conclusion ......................................................................................... 46

Certificate of Compliance ................................................................... 48

Certificate of Service .......................................................................... 49

Addendum: Constitutional and Statutory Provisions

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
  960 F.2d 1020 (Fed. Cir. 1992) .................................................................. 45

*Askew v. Sheriff of Cook Cnty.,*
  568 F.3d 632 (7th Cir. 2009) ...................................................................... 37

*Baker v. Dorfman,*
  239 F.3d 415 (2d Cir. 2000) ........................................................................ 38

*Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.,*
  522 U.S. 192 (1997) ...................................................................................... 40

*Bell v. Reno,*
  218 F.3d 86 (2d Cir. 2000) .......................................................................... 26

*Booking v. Gen. Star Mgmt. Co.,*
  254 F.3d 414 (2d Cir. 2001) ........................................................................ 38

*Brennan v. Nassau Cnty.,*
  352 F.3d 60 (2d Cir. 2003) .......................................................................... 38

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
  567 F.3d 79 (2d Cir. 2009) .............................................................. 1, 11, 45

*Brown v. Bd. of Educ.,*
  347 U.S. 483 (1954) ...................................................................................... 41

*Centifanti v. Nix,*
  865 F.2d 1422 (3d Cir. 1989) ...................................................................... 40

*Cmty. Health Care Ass'n v. Mahon,*
  106 F. Supp. 2d 523 (S.D.N.Y. 2000) ........................................................ 37

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,*
  102 F.3d 677 (2d Cir. 1996) ................................................................. *passim*

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990) ...................................................................................... 16

iv

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Dunn v. Commodity Futures Trading Comm'n,*
   519 U.S. 465 (1997) ........................................... 32

*In re Hess' Estate,*
   257 N.Y.S. 278 (Surrogate's Ct. 1932) ................... 25

*Ikelionwu v. United States,*
   150 F.3d 233 (2d Cir. 1998) ........................... 42, 43

*Ivani Contracting Corp. v. City of N.Y.,*
   103 F.3d 257 (2d Cir. 1997) ........................... 42, 45

*Johnson v. Smithsonian Inst.,*
   189 F.3d 180 (2d Cir. 1999) .............................. 16

*Johnson-Schmitt v. Robinson,*
   990 F. Supp. 2d 331 (W.D.N.Y. 2013) .................... 25

*Klehr v. A.O. Smith Corp.,*
   521 U.S. 179 (1997) ...................................... 40

*Kuhnle Bros., Inc. v. Cnty. of Geauga,*
   103 F.3d 516 (6th Cir. 1997) .......................... 40, 41

*La Parr v. City of Rockford,*
   100 F.2d 564 (7th Cir. 1938) ............................. 45

*Lennon v. Seaman,*
   63 F. Supp. 2d 428 (S.D.N.Y. 1999) ...................... 46

*Mahmood v. Research in Motion Ltd.,*
   2012 WL 242836 (S.D.N.Y. Jan. 24, 2012) ............... 45

*Mancuso v. N.Y. State Thruway Auth.,*
   86 F.3d 289 (2d Cir. 1996) ..........................*passim*

*Northrop Corp. v. McDonnell Douglas Corp.,*
   705 F.2d 1030 (9th Cir. 1983) ........................... 20

*Owens v. Okure,*
   488 U.S. 235 (1989) ...................................... 39

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002) ............................................................ 39

*People v. Pirillo*,
911 N.Y.S.2d 272 (App. Div. 2010) ............................................ 25

*Peregrine Myanmar Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996) ...................................................... 22, 36

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
134 S. Ct. 1962 (2014).............................................. 40, 42, 43, 46

*Readco, Inc. v. Marine Midland Bank*,
81 F.3d 295 (2d Cir. 1996) ........................................................ 38

*Seneca Nation of Indians v. New York*,
383 F.3d 45 (2d Cir. 2004) ........................................................ 16

*Shomo v. City of N.Y.*,
579 F.3d 176 (2d Cir. 2009) ...................................................... 42

*Stolow v. Greg Manning Auctions Inc.*,
80 F. App'x 722 (2d Cir. 2003).................................................. 40

*Stone v. Pepmeyer*,
2011 WL 1627076 (C.D. Ill. Apr. 28, 2011)................................ 37

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ........................................................ 24

*United States v. Cowan*,
396 F.2d 83 (2d Cir. 1968) ........................................................ 25

*United States v. Lemos*,
2010 WL 1192095 (S.D.N.Y. Mar. 26, 2010) .............................. 44

*United States v. Portrait of Wally, A Painting By Egon Schiele*,
2002 WL 553532 (S.D.N.Y. Apr. 12, 2002) ................................ 46

*United States v. Proyect*,
989 F.2d 84 (2d Cir. 1993) ........................................................ 24

# TABLE OF AUTHORITIES—continued

**Page(s)**

*United States v. Vargas-Cordon,*
   733 F.3d 366 (2d Cir. 2013) ........................................ 26

*Va. Hosp. Ass'n v. Baliles,*
   868 F.2d 653 (4th Cir. 1989) ................................. 40, 41

*Xiao Ji Chen v. U.S. Dep't of Justice,*
   471 F.3d 315 (2d Cir. 2006) ........................................ 32

*Zervos v. Verizon N.Y., Inc.,*
   252 F.3d 163 (2d Cir. 2001) ........................................ 17

## CONSTITUTIONS

N.Y. CONST. art. VII, § 8 (1894) ..................................... 28

N.Y. CONST. art. X, § 5 ............................................ 4, 21

N.Y. CONST. art. XI, § 1 ............................................... 37

N.Y. CONST. art. XV, § 1 .........................................*passim*

N.Y. CONST. art. XV, § 2 ..................................... 7, 32, 33

N.Y. CONST. art. XV, § 3 ............................................... 32

## STATUTES, RULES, & REGULATIONS

28 U.S.C. § 1291 ........................................................ 3

28 U.S.C. § 1331 ........................................................ 3

28 U.S.C. § 1343 ........................................................ 3

42 U.S.C. § 1983 .................................................*passim*

N.Y. CANAL LAW § 2 ..................................................... 7

N.Y. CANAL LAW § 5 ............................................. 6, 8, 21

N.Y. CANAL LAW § 6 ................................................. 6, 8

# TABLE OF AUTHORITIES—continued

**Page(s)**

N.Y. CANAL LAW § 53 ............................................................ 27

N.Y. CANAL LAW § 54 ............................................................ 27

N.Y. C.P.L.R. § 214 ............................................................... 39

N.Y. PUB. AUTH. LAW § 353 .....................................................4

N.Y. PUB. AUTH. L. § 354 ................................................ 4, 9, 21

N.Y. PUB. AUTH. LAW § 382 .....................................................8

N.Y. Sess. Laws ch. 766 ...........................................................6

Fed. R. Civ. P. 19 ............................................................ *passim*

## OTHER AUTHORITIES

AMENDMENTS PROPOSED TO NEW YORK CONSTITUTION 1895-1937
(1938) ................................................................... 28, 29

BLACK'S LAW DICTIONARY (3d ed. 1933) ............................... 25, 26

BLACK'S LAW DICTIONARY (10th ed. 2014) ............................. 24, 26

ROBERT A. CARTER, NEW YORK STATE CONSTITUTION: SOURCES OF
LEGISLATIVE INTENT (2d ed. 2001) ................................... 27

CHARLES Z. LINCOLN, THE CONSTITUTIONAL HISTORY OF NEW YORK
(1906) .................................................................... 29, 30

CARMELLA MANTELLO, THE N.Y. STATE CANAL CORP. (2009) .......... 27

N.Y. STATE THRUWAY AUTH., AUDITED FINANCIAL STATEMENTS:
DEC. 31, 2010 & 2009 (2011) ........................................ 45

N.Y. STATE THRUWAY AUTH., AUDITED FINANCIAL STATEMENTS:
DEC. 31, 2011 & 2010 (2012) ........................................ 44

N.Y. STATE THRUWAY AUTH., AUDITED FINANCIAL STATEMENTS:
DEC. 31, 2012 & 2011 (2013) ........................................ 44

## TABLE OF AUTHORITIES—continued

Page(s)

OFFICE OF THE STATE COMPTROLLER, ASSESSMENT OF THE THRUWAY
AUTHORITY'S FINANCES & PROPOSED TOLL INCREASE (2012) .................... 10

REVISED RECORD OF THE CONSTITUTIONAL CONVENTION OF THE STATE
OF NEW YORK (1938) ................................................................................... 27

*Segregation of Topeka's Public School System 1879-1951*,
NATIONAL PARK SERVICE, http://www.nps.gov/brvb/historyculture/
topekasegregation.htm ................................................................................. 41

WILLIAM H. STEELE, REVISED RECORD OF THE CONSTITUTIONAL
CONVENTION OF THE STATE OF NEW YORK: MAY 8, 1894 TO SEPT. 29,
1894 (1900) .................................................................................................. 28

## INTRODUCTION

The New York State Thruway Authority collects hundreds of millions of dollars in tolls from truckers and other motorists each year. Although the Thruway Authority uses a substantial amount of those tolls to pay for the construction and upkeep of roads and bridges, it also diverts a substantial portion to fund an unrelated billion-dollar redevelopment project that is intended to foster tourism in upstate New York. This Court has already held that a functionally identical toll-diversion regime violated the Commerce Clause of the U.S. Constitution. *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79 (2d Cir. 2009). Plaintiffs—three commercial trucking companies and their national trade association—accordingly filed this class action against the Thruway Authority and other defendants to enjoin the further collection of the excessive truck tolls and to recover the unconstitutional tolls that truckers have paid during the limitations period.

Acknowledging, but disagreeing with, this Court's holding in *Mancuso v. New York State Thruway Authority*, 86 F.3d 289 (2d Cir. 1996), that the Thruway Authority does not enjoy Eleventh Amendment immunity (JA103–04), the district court decided to "recognize constitutional reality in a different way": It deemed the State of New York, which **does** have Eleventh Amendment immunity, to be a necessary and indispensable party to this action. JA106. The court therefore dismissed

1

the action for failure to join a necessary party that cannot be joined under Federal Rule of Civil Procedure 19. That ruling must be reversed because it is irreconcilable with both *Mancuso* and *ConnTech Development Co. v. University of Connecticut Education Properties, Inc.*, 102 F.3d 677 (2d Cir. 1996).

The Court should not stop there, however. In their motion to dismiss, defendants argued in the alternative that the Complaint was not timely filed. The district court pretermitted that issue. But because the timeliness issue involves a pure question of law, considerations of efficiency, judicial economy, and preservation of party resources warrant resolving it now. Doing so would be a straightforward matter because the law is as clear on this point as it is on the indispensable-party issue: The Thruway Authority's collection of excessive truck tolls is an ongoing series of constitutional violations governed by the separate-accrual rule, so the Complaint is timely. We urge the Court to so hold in order to spare another round of briefing in the district court and a potential second trip to this Court before the merits are ever reached.

## JURISDICTIONAL STATEMENT

Plaintiffs American Trucking Associations, Inc., Wadhams Enterprises, Inc., Lightning Express Delivery Service Inc., and Ward Transport & Logistics Corp. (collectively, "ATA") filed a class-action complaint against the New York State Thruway Authority, the New York

2

State Canal Corporation, and eight other defendants in their official capacities (collectively, the "Thruway Authority"), raising claims under 42 U.S.C. § 1983 and the Commerce Clause of the U.S. Constitution. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. The district court issued an order dismissing the action in its entirety on August 6, 2014, and entered judgment on August 7, 2014. Plaintiffs filed their Notice of Appeal on September 4, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the district court erred in holding that the State of New York is an indispensable party under Rule 19.

2.     Whether the Complaint was timely filed.

## STATEMENT OF THE CASE

On November 14, 2013, ATA filed this class action against the Thruway Authority in the U.S. District Court for the Southern District of New York. ATA asserts claims under the Commerce Clause of the U.S. Constitution on behalf of all individuals and motor carriers who, since November 14, 2010, have paid tolls to the Thruway Authority for trucks traveling in interstate commerce on the New York Thruway.

In an unpublished order (JA100–07), the district court (McMahon, J.) granted the Thruway Authority's motion to dismiss for failure to join an indispensible party that cannot be joined under Rule 19. The facts

3

relevant to this appeal, which must be taken in the light most favorable to ATA, are as follows.

### A. The Thruway Authority, The Roads, And The New York Canal System.

1.     The Thruway Authority is an independent public-benefit corporation chartered by the State of New York. As such, it is an autonomous entity that as a matter of law is neither an "alter ego" nor an "arm" of the state. JA10 ¶¶ 16–17 (citing *Mancuso*, 86 F.3d at 297). The statutory purpose of the Thruway Authority is "to finance, construct, reconstruct, improve, develop, maintain, or operate" the state's Thruway System—i.e., the roads and bridges that make up the New York State Thruway. N.Y. PUB. AUTH. LAW § 353; JA11 ¶ 24. The Thruway Authority's chartering statute specifically provides that the Thruway Authority may "sue and be sued," "make contracts," and "borrow money and issue negotiable notes." N.Y. PUB. AUTH. L. § 354(1), (7), (12).

"No provision of New York law requires the state to fund the Thruway Authority's operations." *Mancuso*, 86 F.3d at 295. Rather, "the Thruway Authority is self-funded." *Id*. It receives no tax dollars from the state and only a small amount of federal aid. JA13 ¶¶ 44–45. As this Court has held, "the state is not legally obligated to pay for the Thruway Authority's debts." *Mancuso*, 86 F.3d at 296 (citing N.Y. CONST. art. X, § 5). Instead, the Thruway Authority is a "strictly . . . user-supported

4

[s]ystem" that depends almost entirely on toll revenues to operate, maintain, and police the roads and bridges that it administers. JA13–14 ¶¶ 46–47. "The reality is that the Thruway Authority is structured . . . to be self-sustaining." *Mancuso*, 86 F.3d at 296 (internal quotation marks omitted).

This arrangement affords the Thruway Authority the autonomy to operate largely without interference from the Legislature or any other department or instrumentality of the state government. The state, for its part, avoids having to provide for the Thruway using tax revenues from the state's general fund; avoids budget and appropriations fights and public scrutiny over the use of the toll revenues (which total hundreds of millions of dollars each year (JA17–20 ¶¶ 80, 87, 93, 99)); and puts the Thruway Authority's massive cash reserves outside the reach of courts in suits against the state.

2.    Historically, the State of New York had operated the "barge canal," which is the network of waterways that made up the old commercial barge route used to transport goods in the nineteenth and early twentieth centuries. In 1992, the Legislature amended the New York Canal Law to transfer from the New York Department of Transportation to the Thruway Authority the management of the state's "Canal System"—which, as defined by the statute, includes the barge canal, other canals, former canals, and hundreds of miles of hiking trails and other

5

recreational facilities stretching across upstate New York. JA7 ¶ 2; JA10–11 ¶¶ 15, 26, 29; JA15 ¶¶ 62–63; *see* N.Y. CANAL LAW § 5 (providing that "[t]he powers and duties of the commissioner of transportation relating to the New York state canal system . . . are transferred to and merged with" the Thruway Authority); *see also id.* § 6(1); 1992 N.Y. Sess. Laws ch. 766. As a result, New York no longer had to support the barge canal or the larger Canal System from the state's general fund (JA15 ¶ 64), and future expenditures on the system were substantially insulated from democratic accountability.

The state constitution provides, however, that the Legislature "shall not sell, abandon, or otherwise dispose of the now existing or future improved barge canal, the divisions of which are the Erie canal, the Oswego canal, the Champlain canal, and the Cayuga and Seneca canals, or of the terminals constructed as part of the barge canal system; nor shall it sell, abandon or otherwise dispose of any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system." N.Y. CONST. art. XV, § 1.[1] In other words, certain specified stretches of canal and the

---

[1] As noted, the state constitution's definition of the "barge canal" and "barge canal system" is much more limited in scope than the "Canal System" defined by the New York Canal Law. The constitution excludes canals that were not part of the specified "barge canal" when the provision was ratified or the improvements thereto, and does not include other canals, defunct canals, hiking trails, and other real property and improvements that make up the Canal System as defined by the Canal

associated "terminals shall remain the property of the state and under its management and control forever" (*id.*), subject to additional limitations, the most notable of which is that "[t]he prohibition of sale, abandonment, or other disposition contained in section 1 . . . shall not apply to barge canal lands, barge canal terminals or barge canal terminal lands which have or may become no longer necessary or useful for canal or terminal purposes; nor to any canal lands and appertaining structures constituting the canal system prior to the barge canal improvement which have or may become no longer necessary or useful in conjunction with the now existing barge canal" (*id.* § 2).

The Canal Law specifies that the "canal system shall remain the property of the state and under its management and control as exercised by and through" the Thruway Authority and its subsidiary, the Canal Corporation, "which shall be deemed to be the state for the purposes of

Law. *Compare* N.Y. CONST. art. XV, § 1, *with* N.Y. CANAL LAW § 2(1) (defining the "New York State Canal System," "Canal System," and "Barge Canal System" to "mean all the canals, canal lands, feeder canals, reservoirs, canal terminals and canal terminal lands of the state as hereinafter defined"); *id.* § 2(2) (defining "canals" to "mean the channel and adjacent state-owned banks of the inland waterways of the state constructed, improved, or designated by authority of the legislature as canals and shall include canalized rivers and lakes, canal water supply reservoirs, canal water supply feeder channels and all appertaining structures necessary for the proper maintenance and operation of the canals"); *id.* § 2(8) (defining "canal lands" as "all lands and waters forming a part of the canal system title to which was originally vested in the state, acquired by the state or which may in the future be acquired by the state for canal purposes").

7

such management and control of the canals but for no other purposes." N.Y. CANAL LAW § 6(1); *accord id*. § 5 (specifying that the Thruway Authority "shall be deemed to be the state in exercising the powers and duties transferred pursuant to this section but for no other purposes").

3.     The New York State Canal Corporation is a subsidiary of the Thruway Authority that, like the Thruway Authority, is a public-benefit corporation. It was created by statute to operate, maintain, and promote the statutorily defined Canal System under the auspices of the Thruway Authority. JA11 ¶¶ 27–29; N.Y. PUB. AUTH. LAW § 382. Thus, through the Canal Corporation, the Thruway Authority manages (i) the barge canal as defined in Article XV, Section 1, of the state constitution, (ii) other canals that are not covered by Article XV, and (iii) more than 260 miles of recreational trails and associated recreational facilities across upstate New York that are adjacent to the waterways or follow remnants of historic canals that date back to the early 1800s. JA16 ¶ 67.

As a tourist attraction, the Canal System is an economic boon to the villages, hamlets, and towns that line its 524 miles of waterways. JA7–8 ¶¶ 3–4; JA16 ¶ 68. Estimates suggest that canal-related tourism generates nearly $400 million in revenues annually for those who live and do business along the canals. JA7–8 ¶ 4; JA16 ¶¶ 69–71; JA22 ¶ 117. But those individuals and businesses do not bear the economic burden of maintaining and operating the canals. JA7–8 ¶ 4; JA22 ¶ 118. Nor do

canal users pay their own way: Recent estimates show that the canals generate only approximately $2 million dollars in user fees annually—far short of the sums that the Thruway Authority annually funnels to the Canal System. JA18 ¶ 84.

### B. The Thruway Authority's Collection And Use Of Toll Revenues.

As every motorist in New York knows, the Thruway Authority collects tolls for use of the roads and bridges that make up the Thruway System, and it uses toll revenues to construct and maintain the Thruway System's infrastructure. *See* N.Y. PUB. AUTH. LAW § 354(8). For commercial truckers, many of whom use the Thruway System every day, these tolls are substantial. For example, the largest trucks—seven-axle "high" vehicles—pay a toll of $49.25 just to cross the Tappan Zee Bridge. JA15 ¶ 57.

These tolls generate substantially more revenue than the Thruway Authority actually expends on the Thruway System. JA7 ¶ 3; JA12–13 ¶¶ 31–37. As alleged in the Complaint, the Thruway Authority uses the extra toll revenues not to maintain or improve the roads that the truckers are paying to use, but principally to support the Canal System as a recreational area, tourist attraction, and engine of economic development for upstate New York. JA7 ¶ 3; JA16 ¶ 68. The Thruway Authority's audited financial statements, which are public, judicially noticeable

documents that ATA cited in the Complaint, report that the Thruway
Authority expends tens of millions of dollars in toll revenues on the canals,
hiking trials, and associated recreational facilities each year. JA17–20
¶¶ 79–103. According to the New York State Comptroller, the Thruway
Authority has expended $1.1 billion on the Canal System since 1992. JA7
¶ 3; JA17 ¶ 75 (citing OFFICE OF THE STATE COMPTROLLER, ASSESSMENT
OF THE THRUWAY AUTHORITY'S FINANCES & PROPOSED TOLL INCREASE 7
(2012) ("COMPTROLLER'S ASSESSMENT")). These expenditures are on the
rise: The Thruway Authority spent more than $80 million of toll money on
the Canal System in 2007, and more than $100 million in 2012. JA7 ¶ 3;
JA17 ¶¶ 76–77 (citing COMPTROLLER'S ASSESSMENT 7–8). The Thruway
Authority has estimated that it will cost another $436.5 million to
maintain, repair, and operate the Canal System between 2013 and 2016—
an average annual expenditure of approximately $109.1 million. JA20
¶ 105.

### C.    The Proceedings Below.

1.    ATA filed suit on behalf of a class of commercial truckers,
alleging that the Thruway Authority has violated their rights under the
Commerce Clause by overcharging them for their use of the roads and
bridges that make up the Thruway System and diverting the extra toll
revenues to non-road uses—including canals, hiking trails, and other
recreational facilities. *See* JA8 ¶ 5; JA26–27 ¶¶ 148–154. ATA seeks an

10

injunction preventing the future collection of excessive truck tolls as well as return of the unconstitutional tolls that the Thruway Authority has collected from the class members in the three years (i.e., the limitations period) leading up to the filing of the Complaint on November 14, 2013, and to such date as the Thruway Authority ceases collecting excessive tolls. ATA argues that the Thruway Authority's collection of excessive tolls is forbidden by this Court's decision in *Bridgeport*, *supra*, because (i) the toll-diversion scheme discriminates against interstate commerce and interstate commercial actors, (ii) the truck tolls are excessive in relation to the constitutionally permissible ends that the tolls are designed to promote, and (iii) the truck-toll rates are not based on a fair approximation of the truckers' use of the Thruway System. JA8 ¶ 5; JA26–27 ¶¶ 148–154.

2.    In its motion to dismiss (Dkt. 21), the Thruway Authority admitted the basic facts of the case—namely, that it collects more in toll revenues than it uses on the Thruway system and diverts excess toll revenues to support the Canal System. The Thruway Authority also did not deny that it is an independent legal entity that does not enjoy Eleventh Amendment immunity from suit in federal court. Instead, it argued that (i) the State of New York is a necessary party that ATA did not and cannot join because New York has Eleventh Amendment immunity; (ii) the suit was barred by the three-year statute of limitations

11

and the doctrine of laches because the Thruway Authority has been collecting the excessive tolls for many years; and, briefly, (iii) the underlying claim lacks merit.

3.    In granting the Thruway Authority's motion to dismiss, the district court acknowledged this Court's holding in *Mancuso* that the Thruway Authority does not enjoy Eleventh Amendment immunity from suit in federal court. *See* JA100, 102, 105–06 (citing *Mancuso*, *supra*). But the district court expressed disagreement with *Mancuso*, stating: "Were I writing on a blank slate, I would conclude that the Thruway Authority was in fact cloaked with sovereign immunity when acting in its capacity as manager and controller of the canal system . . . [a]nd I would dismiss this lawsuit on that ground." JA106. The court acknowledged, however, that *Mancuso* is binding precedent that forbids that outcome. *See id.*

The district court instead decided that it would "recognize constitutional reality in a different way" by declaring the ***state*** to be a necessary party under Rule 19 that cannot be joined because of its sovereign immunity. JA106. The court accordingly dismissed the action on that ground without ruling on the timeliness issue or considering the merits of the case. *Id.* In support of its Rule 19 ruling, the district court opined that the state "has a real, cognizable financial interest in the outcome of a lawsuit that seeks to invalidate the State's legislated 'provision for the expense of the superintendence and repairs' and 'for the

improvement of the canals'—expenses that are, ultimately, the unrelinquishable responsibility of New York State and no one else." *Id.* (citation omitted). In other words, because the state constitution imposes on New York the "obligation not to 'abandon' the canal system" (JA105), and because this suit threatens the legislatively chosen mechanism for fulfilling that responsibility—assigning the administration of the Canal System to the Thruway Authority—the state has an interest in the outcome of the suit. In the district court's view, the state is a necessary party because if ATA is successful in this litigation, the state "will have to find a way to fund the system so as to avoid 'abandoning' it." *Id.*

## SUMMARY OF THE ARGUMENT

**I.** The ruling below is an end-run around this Court's decision in *Mancuso*: It expressly tries to accomplish "in a different way" what this Court has foreclosed, by conferring Eleventh Amendment immunity on the Thruway Authority derivatively when this Court has said that there is no such immunity directly.

The problem with that tactic, aside from its inconsistency with *Mancuso*, is that the ruling also directly contravenes another binding precedent—*ConnTech*, *supra*. In that case—which ATA fully briefed below but the district court did not address—this Court held that when a state has structurally distanced itself from a public-benefit corporation—even though the corporation's activities are ones that the state has authorized

13

and desires to have performed—the corporation may not avail itself of Eleventh Amendment immunity by asserting that the state has a financial interest in the project that the corporation is operating. The whole point of granting autonomy to a public-benefit corporation is for the state to disavow any legal interest or financial stake in order to limit liability and accountability both for the state and for the corporation. That choice has consequences: Autonomous public-benefit corporations may not don and doff the mantle of the state to suit their momentary litigation strategy. In addition, *ConnTech* reaffirms the strict rule that a state must assert its own interest in order to invoke Rule 19; a public-benefit corporation or other third party may not assert a Rule 19 interest on the "absent" state's behalf. That rule provides an independent basis for reversal.

The district court's concern with the state's duty not to "abandon" the barge canal is misplaced. "Abandon" is a legal term with a concrete legal meaning: The state is forbidden to sell or disclaim its ***ownership interest*** in the barge canal as long as the barge canal remains necessary and useful for commercial barge traffic. Nothing in this suit implicates, much less threatens, that.

Finally, the district court's holding rests on an incorrect view of what constitutes a legal interest sufficient to render the state a necessary party under Rule 19. A judgment in ATA's favor will not compel the state to do anything; nor will the state's absence from the lawsuit preclude a complete

14

remedy. To be sure, an injunction would limit the Thruway Authority's continuing ability to divert toll revenues to non-Thruway purposes, but that does not make the state a necessary party—not even if the state might ultimately decide to use tax revenues to replace the improperly diverted toll revenues. If that were sufficient to warrant dismissal under Rule 19 in this case, then no individual-capacity suit for damages under 42 U.S.C. § 1983 could ever be brought in federal court either, because a state's indemnification of its officials would confer Eleventh Amendment immunity in all those actions as well. That is not how federal jurisdiction and Rule 19 work.

II.    If, as we submit it must, the Court reverses the district court's order dismissing on Rule 19 grounds, the Court should exercise its discretion to rule on the timeliness of the Complaint as well. That purely legal question is one that the Thruway Authority raised and the parties briefed below. It is fully ripe for this Court's consideration. And the answer is straightforward: The law is settled that when, as here, constitutional violations are ongoing, the statute of limitations is triggered anew by each unconstitutional act. Hence, a suit is timely if it is filed within the limitations period following the last unconstitutional act. Here, the Thruway Authority continues to collect unconstitutional tolls from truckers each and every day, so the suit is timely, and prospective injunctive relief and retrospective damages within the limitations period

are available if ATA prevails on the merits of its challenge. As for the doctrine of laches—which the Thruway Authority also invoked below—the law of this Circuit is clear that the defense is unavailable when, as here, there is an applicable statute of limitations.

This Court should confirm the timeliness of the suit and thereby remove any remaining threshold obstacles to the speedy resolution of the constitutional violations at issue here. No legitimate interest of the parties or of judicial economy would be served by a remand of the timeliness question for relitigation below (and a potential second appeal of the ensuing ruling to this Court) before the merits of this case may be reached.

## ARGUMENT

## I.   NEW YORK IS NOT AN INDISPENSABLE PARTY UNDER RULE 19.

Although this Court typically reviews a district court's Rule 19 determination under an abuse-of-discretion standard (*see Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999)), the district court's ruling that New York is an indispensable party rests on an interpretation of the state constitution (*see infra* pp.23–35) that is subject to *de novo* review (*see, e.g.*, *Seneca Nation of Indians v. New York*, 383 F.3d 45, 47 (2d Cir. 2004)). In addition, if a district court's ruling rests on an "error of law," it is by definition an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would

16

necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ."); *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) ("A district court 'abuses' or 'exceeds' the discretion accorded to it when . . . its decision rests on an error of law . . . ."). That is what happened here.

To be specific, the decision below cannot be squared with binding Second Circuit precedent on the Thruway Authority's lack of sovereign immunity (*Mancuso*) and the inapplicability of Rule 19 when an autonomous public-benefit corporation asserts a financial interest in a case on behalf of the state that created it (*ConnTech*). This suit does not challenge any action of the state or any action of the Thruway Authority acting as the state. And it does not implicate the state's constitutional duty not to abandon the barge canal, much less threaten to cause a default on that duty. Accordingly, the order of dismissal should be reversed.

### A. The District Court's Rule 19 Determination Is Irreconcilable With Controlling Second Circuit Precedent.

The district court's Rule 19 determination confers on the Thruway Authority by roundabout means the Eleventh Amendment immunity that this Court has expressly held the Thruway Authority does not possess. Both the means employed and the end achieved by the decision below are forbidden as a matter of clear Second Circuit precedent.

17

**1.** In *Mancuso*, this Court straightforwardly held that "the Thruway Authority is not entitled to Eleventh Amendment immunity." 86 F.3d at 296. As this Court explained, "[t]he Thruway Authority . . . is not a traditional state agency, but a public entity that is generally self-funded and . . . is not under significant state control." *Id*. That is because "New York State has given the Thruway Authority an existence quite independent from the state." *Id*.

**2.** The district court disagreed with that ruling and would have preferred to dismiss the suit on the ground that the Thruway Authority possesses Eleventh Amendment immunity under the circumstances of this case. JA105–06.[2] Acknowledging that it could not do so because *Mancuso* is binding precedent (JA106), the district court therefore decided to "recognize constitutional reality in a different way"—i.e., find an alternative ground for dismissing that would have the practical effect of conferring sovereign immunity on the Thruway Authority despite *Mancuso* (*id.*).

---

[2] The district court speculated that if the question whether the Thruway Authority has sovereign immunity had arisen in this case rather than *Mancuso* the result might have been different because *Mancuso* "did not implicate the canal system in the slightest particular." JA105–06. But *Mancuso **did*** consider the Thruway Authority's operation of the Canal System, which the Court identified as "a state, not a local, function." *Mancuso*, 86 F.3d at 295. The Court simply concluded that operation of the Canal System was insufficient to render the Thruway Authority an arm of the state rather than "a municipal corporation or other political subdivision" for Eleventh Amendment purposes. *Id*. at 293, 296.

18

The means that the district court chose was to hold that New York has a financial interest in this case because it has "unrelinquishable responsibility" for canal expenses, making the state a necessary party under Rule 19 that cannot be joined because of its Eleventh Amendment immunity. JA106. In that way, the Thruway Authority gets to enjoy the benefits of the sovereign immunity that *Mancuso* held it does not have.

But *Mancuso* forecloses this result. As this Court explained, "there can be no doubt that the state is not legally obligated to pay for the Thruway Authority's debts" because the New York Constitution "expressly provides that the state shall not be liable for the obligations of public corporations, such as the Thruway Authority." 86 F.3d at 296. Accordingly, judgments against the Thruway Authority do not and cannot "place the state treasury at risk." *Id.* As a matter of law, any refunds of unconstitutional tolls would be assessed against the Thruway Authority itself and come out of its own accounts, not the state's. Consequently, this lawsuit threatens no harm that Eleventh Amendment immunity exists to prevent.

**3.** Even if *Mancuso* did not dispositively resolve the matter, this Court's decision in *ConnTech* does.

The defendant in *ConnTech* was a public-benefit corporation that the State of Connecticut had created in order to oversee a redevelopment project, just as New York created the Thruway Authority and its

19

subsidiary the Canal Corporation as public-benefit corporations to oversee the Thruway and the Canal System. *See ConnTech*, 102 F.3d at 679. When the public-benefit corporation in *ConnTech* was sued by the private developer with which it had contracted to build the project, the corporation moved to dismiss the case on the ground that Connecticut had a financial interest in the case and therefore was a necessary party that had not been and could not be joined under Rule 19—exactly what the Thruway Authority argued here.

This Court flatly rejected that argument for two independent reasons, each of which disposes of the Rule 19 issue in this case.

*First*, the Court explained that, by contract, Connecticut had "deliberately" structured its relationship with the defendant public-benefit corporation so as to "disavow" any legal interest in the corporation's transactions and activities (while still having the corporation perform functions that the state sought to have accomplished). *ConnTech*, 102 F.3d at 682. Hence, because Connecticut had sought to "keep . . . at arm's length from the activities" that ultimately occasioned the suit in *ConnTech*, the state was not a necessary party, and dismissal for nonjoinder would be improper. *Id.* at 683 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043–44 (9th Cir. 1983)); *see also id.* at 682. In other words, a state and the quasi-public entities that it

20

creates cannot generally take advantage of being legally distinct but then disclaim that independent legal status when it suits their fancy.

Like Connecticut, New York deliberately created legal separation between itself and the Thruway Authority. What Connecticut achieved by contract, New York achieved through constitutional and statutory provisions. It disclaimed any liability for the obligations of public-benefit corporations like the Thruway Authority. *See* N.Y. CONST. art. X, § 5. It granted the Thruway Authority the autonomy to "sue and be sued," "make contracts," and "borrow money and issue negotiable notes" on its own behalf. N.Y. PUB. AUTH. LAW § 354. And it provided that the Thruway Authority is the "state" "for no other purposes" than for "exercising the powers and duties" exercised under the Canal Law. N.Y. CANAL LAW § 5.

Moreover, the New York Legislature's purpose in establishing the Thruway Authority as an autonomous public-benefit corporation was the same as the Connecticut legislature's purpose for establishing the public-benefit corporation in *ConnTech*: to insulate the state and the public-benefit corporation from each other and make them legally and functionally independent. Under this arrangement, New York is free of all legal and financial responsibility for the activities and liabilities of the Thruway Authority, and the Thruway Authority is free of the legal restrictions and political checks that typically accompany direct action by the state. *See Mancuso*, 86 F.3d at 295–96 (holding that the Thruway

21

Authority is not entitled to sovereign immunity because the Legislature made it self-funded, does not assume liability for its debts or expenditures, and holds no veto power over its actions). In other words, the New York Legislature made a choice to structure the Thruway Authority as an independent entity; and both the state and the Thruway Authority have benefitted and continue to benefit immeasurably from the separation. That the Thruway Authority might now wish to evade federal jurisdiction does not and cannot override the Legislature's choice.

*Second*, this Court held in *ConnTech* that a public-benefit corporation is forbidden to assert an interest on behalf of the state for Rule 19 purposes; only the state itself can do that. 102 F.3d at 683 ("It is the absent party that must claim an interest for Rule 19(a)(2) purposes.") (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996)) (internal quotation marks and alteration omitted). The Court therefore held that the defendant's "self-serving attempts to assert interests on behalf of Connecticut fall outside the language of Rule 19(a)(2), and thus cannot be the basis for [the defendant's] necessary party argument." *Id*. Here, too, New York was required to itself invoke Rule 19 and the Eleventh Amendment if it believed that it has a legal interest in this case; if New York had wished to take on the Thruway Authority's judgment debts, it could have done so. But the state could not have its cake and eat

it, by staying on the sidelines while the Thruway Authority attempted to assert a Rule 19 interest on its behalf.

**B.    A Verdict In ATA's Favor Would Not Implicate, Much Less Interfere With, The State's Obligation Not To Abandon The Barge Canal.**

The constitution of New York provides that "[t]he legislature [may] not sell, abandon or otherwise dispose of the now existing or future improved barge canal . . . or of the terminals constructed as part of the barge canal system" or "any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system." N.Y. CONST. art. XV, § 1.[3] The district court reasoned that if ATA "succeed[s] in invalidating the use of Thruway tolls to fund the operations and maintenance of the canal system, it is the State of New York, as the perpetual owner and manager of the canal system, that will have to find a way to fund the system so as to avoid 'abandoning' it. The State thus has a financial interest in the outcome of this lawsuit, which it cannot protect without waiving its sovereign immunity—which it has no intention of doing." JA105.

---

[3]    Again, the constitutional provision covers only the waterway defined as the barge canal, not the much more extensive "Canal System" that the Thruway Authority manages under the terms of the Canal Law. *See* note 1, *supra*.

The district court's order rests on an incorrect interpretation of the state's constitutional obligations to maintain and not to "abandon" the barge canal.

>    1.    **The term "abandon" in Article XV, Section 1, refers to relinquishment of a property right in the barge canal, not to expenditures on economic-development projects.**

a.    In construing a statute or constitutional provision, this Court "begin[s] with its language and plain meaning." *United States v. Awadallah*, 349 F.3d 42, 51 (2d Cir. 2003). When the language of a provision is clear, "its plain meaning ordinarily controls its construction." *United States v. Proyect*, 989 F.2d 84, 87 (2d Cir. 1993).

The terms "abandon" and "abandonment" have a concrete, discrete, settled legal meaning: They refer to renunciation or relinquishment of an ownership interest in real property. *See* BLACK'S LAW DICTIONARY 2 (10th ed. 2014) (defining "abandonment" as "[t]he relinquishing of a right or interest with the intention of never reclaiming it," and in property law specifically, as "[t]he relinquishing of or departing from [real property] with the present, definite, and permanent intention of never returning or regaining possession"); *cf. id.* (defining "abandonment" for purposes of family law as "[t]he act of leaving a spouse or child willfully and without an intent to return").

24

The meaning was the same in 1938, when "abandon" was added to Article XV, Section 1. *See* BLACK'S LAW DICTIONARY 4 (3d ed. 1933) (defining "abandon" as "[t]o desert, surrender, forsake, or cede"; "[t]o give up or cease to use"; "[t]o give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert"); *id.* (defining "abandonment" as "[t]he surrender, relinquishment, disclaimer, or cession of property or of rights" and "the relinquishing of all title, possession, or claim, or a virtual, intentional throwing away of property," for which "[m]ere nonuse[]" or "neglect" is insufficient).

This Court, the courts of this Circuit, and the state courts of New York have long and consistently understood the words to have that meaning. *See, e.g.*, *United States v. Cowan*, 396 F.2d 83, 87 (2d Cir. 1968) ("'The abandonment of property is the relinquishing of all title, possession, or claim to or of it—a virtual intentional throwing away of it.'"); *Johnson-Schmitt v. Robinson*, 990 F. Supp. 2d 331, 343 (W.D.N.Y. 2013) (quoting *Cowan*); *People v. Pirillo*, 911 N.Y.S.2d 272, 273 (App. Div. 2010) (defining "abandonment" as "intentional relinquishment of possession"); *In re Hess' Estate*, 257 N.Y.S. 278, 279 (Surrogate's Ct. 1932) ("in the law of property . . . 'abandons' means 'the relinquishing of all title, possession or claim,' or virtually throwing away the property").

Context confirms the plain meaning of "abandon." As noted above, the state constitution forbids the Legislature to "sell, abandon *or*

***otherwise dispose of***" the barge canal. N.Y. CONST. art. XV, § 1 (emphasis added). Both in 1938 and today, "sell" and "dispose of" are forms of relinquishment of property rights. *See, e.g.*, BLACK'S LAW DICTIONARY 1567 (10th ed. 2014) (defining "sell" as "[t]o transfer (property) by sale"); *id.* at 1537 (defining "sale" as "[t]he transfer of property or title for a price"); BLACK'S LAW DICTIONARY 592 (1933) (defining "dispose of" as "[t]o alienate or direct the ownership of property"); *id.* at 1599 (defining "sell" as "[t]o dispose of by sale"); *id.* at 1576 (defining "sale" as a contract for the "transfer[]" of "the title and the possession of property").

The canon of statutory construction of *noscitur a sociis*—a thing is known by its associates—dictates that Article XV, Section 1, must be read to forbid all forms of disposal of the barge canal, whether by sale, abandonment, or "otherwise"—and only that. *Cf. United States v. Vargas-Cordon*, 733 F.3d 366, 381 (2d Cir. 2013) (applying canon of *noscitur a sociis*). In other words, "sell" and "abandon" are forms of disposal of property, and the constitution prohibits the Legislature from relinquishing its ownership of the barge canal whether by selling it, by giving it away, or by walking away from it with the intent not to retake possession.

Section 1's title—"[d]isposition of canals and properties prohibited" —underscores this conclusion. "It is well established that the title of a statute or section is an indication of its meaning." *Bell v. Reno*, 218 F.3d

86, 91 (2d Cir. 2000). The title thus reinforces that abandonment is a form of disposition—i.e., disposal—of real property.[4]

This suit does not implicate any property rights that New York has in the barge canal, much less require the state to sell or otherwise abandon the barge canal. The state owns the barge canal; the Thruway Authority does not. And ATA's success on the merits cannot change that.

**b.** The legislative history confirms that the no-abandonment provision forbids relinquishment of property rights but does not mandate expenditures. The term "abandon" was added to Article XV, Section 1, in New York's constitutional convention of 1938. ROBERT A. CARTER, NEW YORK STATE CONSTITUTION: SOURCES OF LEGISLATIVE INTENT 169 n.2 (2d ed. 2001). The record of the convention explains that "Section No. 1 is drawn to conform as closely as possible to the [previous version of the] Constitution as it is interpreted with reference to the prohibition against the disposal of the canals." 3 REVISED RECORD OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF NEW YORK 2377 (1938) (remarks of Mr. Brush). The clause had previously provided that "[t]he Legislature shall

---

[4] The Canal Law employs the very same concepts and definitions, providing for the disposition of properties that are not "the barge canal" as defined by the state constitution but that are within the broader set of lands and improvements defined by the statute as the "Canal System." *See, e.g.*, N.Y. CANAL LAW § 53 (providing for "sale of abandoned lands for railroad bridges"); *id.* § 54 (providing for "abandonment and sale of hydropower easements" and permitting Canal Corporation to "sell and convey such easement[s] at private sale to [a] licensed developer").

not sell, lease, or otherwise dispose of the Erie canal, the Oswego canal, the Champlain canal, the Cayuga and Seneca canal, or the Black River canal, but they shall remain the property of the state and under its management forever." N.Y. CONST. art. VII, § 8 (1894). In other words, what mattered—what always mattered—was preservation of property rights.

For example, during the constitutional convention of 1894, the Legislature debated the fate of a stretch of canal in Buffalo that had fallen into disuse and was effectively an open sewer. Mr. Roche "[o]pposed . . . the surrender of any portion of [the canal] to any corporation, or to any municipality, or to any individual" and cautioned that the "means" for ridding the canal of "an unhealthy condition" should "not go as far as the abandonment of a mile of canal." 4 WILLIAM H. STEELE, REVISED RECORD OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF NEW YORK: MAY 8, 1894 TO SEPT. 29, 1894 929–30 (1900). With that worry at the fore, the Legislature proposed—but voters ultimately rejected—an amendment to the 1894 constitution's ban on "sell[ing], leas[ing] or otherwise dispos[ing]" of the canals that would have provided that "[n]o part of any of the said canals . . . shall be abandoned, until the same shall have ceased to be a portion thereof and shall have been declared abandoned by an act of the legislature . . . ." AMENDMENTS PROPOSED TO NEW YORK CONSTITUTION 1895-1937 604 (1938). Another

proposed amendment would have provided that "[t]he abandonment, sale, or other disposition of canals or canal property shall be under and pursuant to general laws only . . . ." *Id.* at 605; *see also id.* at 606, 1915 Note. In other words, the idea was that portions of the barge canal could be sold or "abandoned" only if the Legislature itself specifically acted to authorize the transaction.

Moreover, the Legislature's concern with preserving the barge canal was, from the very beginning, about maintaining that canal as a commercial waterway, in order to protect New Yorkers against predatory practices by railroads (which were the principal alternative form of transportation of goods). "The Convention of 1846 deemed it important to hedge the canals with a constitutional restriction" because "[a] sale of the canals at that time would probably have resulted in their ownership by private corporations, perhaps railroad companies, and under such ownership they would scarcely have afforded the people any protection against freight charges imposed by corporations." 2 CHARLES Z. LINCOLN, THE CONSTITUTIONAL HISTORY OF NEW YORK 650 (1906). As Governor Hoffman proclaimed in 1870, "properly managed," the barge canal "will not only serve the original purpose of [its] construction"—namely, to allow for the commercial carriage of goods by water—"but will act as a check upon exorbitant charges of railroad corporations, and thus keep down the price of transportation for the various articles moving eastward and

westward, to the mutual benefit of producer and consumer." *Id*. at 652; *see also id*. at 623 (1853 remarks of Governor Seymour that "'[w]hile the canals are in good order and under judicious management, combinations cannot be successfully formed between corporations to the detriment of the public interests'").[5]

Nothing in the legislative history of Article XV gives any inkling that the Legislature or the people of New York meant to require (or even permit) the taxing of other alternatives to the railroads—commercial truckers—in order to maintain the barge canal. And certainly nothing suggests that the Legislature meant to require the state to invest in hiking trails and other tourist attractions, however desirable those may be to members of the local communities that abut them.

### 2. The decision below engrafts onto Article XV financial obligations for the state that the Legislature never intended.

The decision below expands the definition of "abandon" to create obligations that Article XV was never meant to impose. Most notably, the decision treats the no-abandonment clause as a requirement that "the

---

[5] The legislative history also reveals concern over "practical abandonment"—i.e., allowing the barge canal to become unusable as a commercial shipping route. *See, e.g.*, 2 LINCOLN, THE CONSTITUTIONAL HISTORY OF NEW YORK 545 (explaining that in 1875, Governor Tilden "thought it was not feasible to dispose of [the canals] on conditions which would require the purchaser to maintain them, and that any other disposition meant their 'practical abandonment'"). In other words, the barge canal would not be a check on the railroads if, for example, it could be sold to the railroads, filled in, and have train tracks laid in its place.

State must make some provision for keeping the canal system up and running." JA105. In the district court's view, that clause means that this suit necessarily implicates the state treasury. From there, the court assumed that the canals (which charge their own user fees, such as recreational permit fees and lock tolls) would not be productive enough to be self-sustaining, and hence that the state would have to make up the shortfall if the Thruway Authority could no longer divert Thruway tolls to supplement the canal fees. In reaching that conclusion, however, the court also assumed that the Thruway Authority (or the state) is required to continue spending on the Canal System at the same rate—now roughly $100 million per year. *Id.* (noting that the "Thruway Authority has applied over $1 billion to the canal system over the last two decades" and opining that "there aren't enough barges . . . to cover that kind of upkeep"). This analysis is incorrect at every step.

    **a.**    The district court apparently read the no-abandonment clause as a requirement that the state fully fund the Canal System—i.e., the billion-dollar economic-development efforts in upstate New York that the Thruway Authority has undertaken and the hundreds of millions of dollars more that the Thruway Authority wishes to spend in the next few years alone. *See, e.g.*, JA17 ¶¶ 75, 77; JA20 ¶ 105. But as explained above, the prohibition against abandonment is about disclaiming a real-property interest in the barge canal as defined in Article XV; it says nothing

31

whatever about **expenditures**, whether on the barge canal or on anything else. What is more, the no-abandonment provision is conditional: Article XV, Section 2, provides that the prohibition against sale or abandonment of the barge canal "shall not apply to barge canal lands, barge canal terminals or barge canal terminal lands which have or may become no longer necessary or useful for canal or terminal purposes; nor to any canal lands and appertaining structures constituting the canal system prior to the barge canal improvement which have or may become no longer necessary or useful in conjunction with the now existing barge canal." N.Y. CONST. art. XV, § 2.

**b.** Although the district court did not mention it, Section **3** of Article XV does impose on the state some limited financial obligations with respect to the barge canal, as defined in the constitution. That section specifies that the state "shall annually make provision for the expenses of the superintendence and repairs of the canals, and **may** provide for the improvement of the canals." N.Y. CONST. art. XV, § 3 (emphasis added).[6]

But nothing forbids the state to divest itself of, and therefore avoid any financial obligations for, even the constitutionally defined barge canal

---

[6]  Reading the no-abandonment requirement of Section 1 to entail upkeep obligations would make Section 3 redundant, violating the "'doctrine that legislative enactments should not be construed to render their provisions mere surplusage.'" *See Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 324-25 (2d Cir. 2006) (quoting *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472 (1997)).

32

if that canal or any part of it has ceased to be useful as a commercial barge route (*see* N.Y. CONST. art. XV, § 2)—much less impose financial obligations with respect to the far more expansive "Canal System." As alleged in the Complaint, the barge canal is now "seldom used for shipping," and the remnants of historic canals and 260 miles of recreational trails "are not used for the commercial transportation of goods" at all. JA16 ¶¶ 66–67. "The Canal System is [instead] a recreation-way and tourist destination" that the Thruway Authority underwrites "in order to promote the economic development of the more than 200 villages, hamlets, and towns along the canals and associated trails." JA16 ¶¶ 65, 68 (citing CARMELLA R. MANTELLO, THE N.Y. STATE CANAL CORP. 63 (2009)). The revenue generated by the canals (which derives not just from lock tolls, but also, and principally, from leases, land sales, and permit fees for noncommercial pleasure crafts, among other sources) totals only $2 million annually. JA18 ¶ 84. In other words, the use of the Canal System for the carriage of goods is modest in the scheme of things. Although the Canal System may be quite valuable to the tourism industry,[7] the barge canal would appear to be unnecessary as a commercial waterway. Hence,

_____

[7] "According to an economic-impact study commissioned in 2002, the Canal System contributes more than $384 million annually in the form of tourism dollars directed to communities in upstate New York." JA16 ¶ 71 (citing MANTELLO, N.Y. STATE CANAL CORP. 63).

nothing in the constitution requires the state to retain ownership of it, let alone spend money on its upkeep.

Even assuming that the barge canal did still function in some minimal way as a commercial transportation route, the constitution would then require only that the state manage and repair it. The constitution **permits**, but does not **require**, the state to make improvements to the barge canal. And nothing in Article XV requires the state to maintain or improve any of the other canals, former canals, hiking trails, tourist attractions, or other recreational facilities and improvements that are within the broader "Canal System" defined by the Canal Law.

**c.** To the extent that Article 3 does continue to impose a constitutional obligation to maintain the barge canal, the cost of performing that obligation is no more than a fraction of what the Thruway Authority chooses to spend on the broader Canal System: Article XV would at most require the state to pay to maintain the barge canal alone, solely to the degree necessary to have it function **as a barge canal**—i.e., as a commercial waterway for shipping goods by barge—and only if and to the extent that the barge canal is still **necessary and useful** as a commercial barge route. There is simply no reason to think that the Thruway Authority would be unable to make those limited expenditures, if any, using funds derived from other sources, such as lock fees and recreational permit fees that are calibrated to the reasonable value of boaters' use of

34

the canals, and permit fees for concessionaires along the canals. The Thruway Authority may wish to undertake massive economic-development projects in upstate New York, and the state may like the results, but none of those endeavors, and none of the expenditures associated with them, are required or even contemplated by Article XV.

The district court's conclusion that the state treasury would be threatened by this suit because of a constitutional obligation to fund a billion-dollar initiative is therefore wrong both factually and legally. But even if that were not the case, the state's supposed financial interest in the Canal System is not a cognizable interest for purposes of Rule 19, as we explain next.

## C. The Decision Below Misconstrues The Interest Requirement Of Rule 19.

In addition to contravening Circuit precedent and misinterpreting the no-abandonment clause, the decision below applies an impermissibly broad interpretation of "interest" as used in Rule 19. The Rule requires joinder (and therefore authorizes dismissal for nonjoinder) if, but only if, "the court cannot accord complete relief among existing parties" in the state's "absence" or if the state "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [state's] absence may: (i) as a practical matter impair or impede the [state's] ability to protect the interest; or (ii) leave an existing party subject to a

substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1).

The Thruway Authority did not argue and the district court did not hold that the state's presence as a party is necessary to protect against multiple recoveries. And if ATA were to prevail on the merits, nothing would "***require***[] the [state] to do anything or change any of its positions." *Peregrine*, 89 F.3d at 48 (emphasis added). The word "require" is the key. *See id.*; *ConnTech*, 102 F.3d at 682. This suit seeks to enjoin the Thruway Authority's future diversion of truck tolls from the roads and to recover ***from the Thruway Authority*** the unconstitutionally excessive tolls that ***it*** has collected. As a legal matter, the state is a mere bystander that would not be "***required*** to do anything under the [requested] award, and thus its absence could in no way preclude complete relief from being granted." *ConnTech*, 102 F.3d at 682 (emphasis added).

That is true regardless of whether, in the event of a judgment in ATA's favor, the Thruway Authority would have to find additional sources of revenue if it wishes to fund redevelopment projects at current levels or instead would have to adopt less ambitious goals for upstate New York's tourism industry that it could support with non-toll revenues. It is equally true regardless of whether the state might ultimately decide to pay for the canals and recreational facilities if it ends up being dissatisfied with how the Thruway Authority is managing those sites.

If the fact that New York may wish (or even be required) at some future point to pay money to support the Canal System were enough to satisfy the interest requirement of Rule 19, then a state would have an "interest" for Rule 19 purposes virtually every time that a Section 1983 suit is brought against state officials in their individual capacities. States are frequently obligated by statue or contract to indemnify their employees in such suits—or else they do so voluntarily. Yet the federal courts never dismiss those suits for failure to join an immune party. *See, e.g.*, *Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 637 (7th Cir. 2009); *Cmty. Health Care Ass'n v. Mahon*, 106 F. Supp. 2d 523, 530–31 (S.D.N.Y. 2000); *Stone v. Pepmeyer*, 2011 WL 1627076, at *2 (C.D. Ill. Apr. 28, 2011).

Indeed, on the view of Rule 19 asserted by the Thruway Authority and adopted by the court below, there would never, for example, be federal-court jurisdiction over any federal claims for damages against a public school in New York. The Legislature has a constitutional obligation to "provide for the maintenance and support of a system of free common schools" (N.Y. CONST. art. XI, § 1), and hence a significant award against a school district or charter school may cause a budget shortfall that the state would ultimately have to make up. Likewise, there would be no federal-court jurisdiction for suits against a private entity that the state deems to be "too big to fail" because the possibility of a state bailout would implicate

37

the state treasury. Those dramatic limitations on federal jurisdiction are not what Rule 19 and the Eleventh Amendment contemplate.

## II.   THIS ACTION WAS TIMELY.

In the court below, the Thruway Authority raised, and the parties briefed, the question whether ATA's claims are barred either by the applicable three-year statute of limitations or by the doctrine of laches. Timeliness of the Complaint is a pure question of law. *See Brennan v. Nassau Cnty.*, 352 F.3d 60, 63 (2d Cir. 2003) ("The application of a statute of limitations presents a legal issue and is . . . reviewed *de novo*."). Because the issue was fully briefed below, this Court can and should resolve it now. *See, e.g.*, *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418–19 (2d Cir. 2001) (this Court has "discretion to consider issues that were raised, briefed, and argued in the District Court, but that were not reached there"); *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000); *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302–03 (2d Cir. 1996). Otherwise, judicial and party resources will be squandered unnecessarily on remand for yet another round of briefing on the issue and a second ruling from the district court on the Thruway Authority's motion to dismiss—which might generate a second appeal, more briefing, more argument, and yet more investment of judicial resources by this Court—all before the merits of this straightforward case can be reached.

### A. The Statute Of Limitations Does Not Bar Suit.

"In section 1983 actions, the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions.'" *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249–50 (1989)). The limitations period here is three years. *See* N.Y. C.P.L.R. § 214(5); *Pearl*, 296 F.3d at 79–80. In addition to injunctive relief, which is purely prospective, ATA is seeking repayment of only those excessive truck tolls that the Thruway Authority has collected since November 14, 2010—three years before the Complaint was filed. *See* JA24 ¶ 136 (defining Class Period). This action is therefore timely.

**1.** The Thruway Authority argued below that the limitations period expired in 1995 (three years after the Legislature amended the Canal Law to transfer management of the Canal System to the Thruway Authority) or in 2011 (three years after the Thruway Authority's Board of Directors adopted the current schedule of toll rates), or else in January 2013 (three years after that toll schedule was implemented). But ATA is not challenging the amendment of the Canal Law, which does not require (or even authorize) the Thruway Authority to collect highway tolls to pay for canals and hiking trails. Nor are we challenging the act of adopting or implementing the toll schedule. This case is about the actual collection of unconstitutionally excessive truck tolls that occurs at every toll plaza

along the Thruway every day. The definition of the class period as coterminous with the limitations period avoids any time-barred requests for monetary relief; and prospective injunctive relief is, of course, available regardless.

**2.** As a matter of law, each unconstitutionally excessive toll that the Thruway Authority collects is a separate, affirmative unlawful act that carries its own three-year statute of limitations. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014) ("when a defendant commits successive violations, the statute of limitations runs separately from each violation" because "[e]ach wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs"); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times") (internal quotation marks omitted); *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 195, 208–09 (1997); *Stolow v. Greg Manning Auctions Inc.*, 80 F. App'x 722, 725 (2d Cir. 2003); *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 521–23 (6th Cir. 1997); *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd in part on other grounds sub nom. Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990); *Centifanti v. Nix*, 865 F.2d 1422, 1432–33 (3d Cir. 1989). ATA straightforwardly and concretely alleges that the Thruway

40

Authority has actually collected, and the class members have actually paid, unconstitutionally excessive tolls during the limitations period. *See, e.g.*, JA7–8 ¶¶ 3–5; JA16–20 ¶¶ 73–103. That is all that matters.

**3.** But even if ATA were instead challenging the amendment of the Canal Act or the adoption of the toll schedule, this suit would still be timely. "A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within [three] years of its enactment." *Kuhnle Bros.*, 103 F.3d at 522; *accord Va. Hosp.*, 868 F.2d at 663 ("'The continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations[.]'") (alteration omitted). Otherwise, long-standing constitutional violations could ***never*** be challenged, because they would always be outside the limitations period. As the Fourth Circuit explained, that view of statutes of limitations would mean that no less a centerpiece of American constitutional jurisprudence than *Brown v. Board of Education*, 347 U.S. 483 (1954), was time-barred and should have been dismissed (*see Va. Hosp.*, 868 F.2d at 663 (citing *Brown* and other significant cases)), because the Kansas statute authorizing Topeka to maintain segregated public schools had been in place since 1879 (*see* Thom Rosenblum, *Segregation of Topeka's Public School System 1879-1951*,

41

NATIONAL PARK SERVICE, http://www.nps.gov/brvb/historyculture/ topekasegregation.htm (last visited Nov. 12, 2014)).[8]

### B. The Doctrine Of Laches Does Not Apply.

The Thruway Authority also invoked the doctrine of laches below. But that doctrine is inapplicable here as a matter of law.

ATA seeks both legal (i.e., monetary) relief and equitable remedies (a declaratory judgment and an injunction). Laches "is an equitable defense that 'bars a plaintiff's equitable claim[s].'" *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998). As a matter of law, it "cannot bar legal relief under § 1983" and hence does not affect ATA's damages claims. *Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 261 (2d Cir. 1997). As for

---

[8] Lest there be any doubt, ATA did not and does not invoke Title VII's legally distinct continuing-violation doctrine. *See Petrella*, 134 S. Ct. at 1969 n.6 (distinguishing separate-accrual or ongoing-violation doctrine from continuing-violation doctrine). The continuing-violation doctrine allows a plaintiff in a Title VII action to prove the existence of a hostile work environment or discriminatory employment policy by stringing together a series of acts, some of which occurred outside the limitations period; and it allows the plaintiff to obtain all the damages, since the beginning of time, resulting from the continuing violation so established. There is no need here to string together separate acts to establish a violation because an independent violation occurs each time the Thruway Authority collects an excessive toll; and ATA is seeking retrospective monetary relief solely for the unconstitutional acts that occurred within the limitations period. In all events, the Thruway Authority cannot seriously contend that it has taken no "'non-time-barred acts . . . in furtherance of [the challenged] policy'" (*Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009)) during the class period, given that it collects hundreds of thousands of tolls at Thruway toll booths each and every day and imposes substantial penalties for nonpayment (*see, e.g.*, JA7–8 ¶¶ 3–5; JA16–20 ¶¶ 73–103).

the equitable remedies, it would make no sense to use the retrospective doctrine of laches to bar prospective relief to prevent future constitutional violations—i.e., violations that have not yet happened. *See Petrella*, 134 S. Ct. at 1979 ("there is no evident basis for immunizing [the defendant's] present and future [violations of the plaintiff's rights], free from any obligation to pay [damages]"). If ATA is successful on its claim for damages but the doctrine of laches were to bar injunctive relief, the Thruway Authority could continue to collect excessive tolls, and ATA would be forced to file a new lawsuit every three years to recoup the unconstitutional exactions. That result would hardly be a wise exercise of the powers of equity.

Moreover, this Circuit has held that when "'a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period'" for equitable claims or for mixed legal and equitable actions like this one. *Ikelionwu*, 150 F.3d at 238. In other words, the statute of limitations is controlling. Thus, "[i]n an equity action, if the applicable legal statute of limitations has not expired, there is rarely an occasion to invoke the doctrine of laches and the burden remains on the defendant to prove all the elements of the defense"— namely, that "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; ***and*** (3) the defendant was prejudiced by the delay." *Id.* at 237–38 (emphasis added).

Here, the Complaint is silent regarding the named Plaintiffs' knowledge of the Thruway Authority's wrongdoing, so that alone suffices to defeat the laches defense at this stage of the case. Likewise, the Thruway Authority can point to nothing in the Complaint suggesting that ATA delayed unreasonably in filing suit, particularly given that ATA seeks prospective injunctive relief for ongoing violations as well as monetary relief limited to the unconstitutional tolls actually collected during the limitations period.

Nor can the Thruway Authority show prejudice. "To establish prejudice, the defendant must prove either (1) that he changed his position in a way that would not have occurred, had plaintiff not delayed; or (2) that the passage of time has impaired his ability to defend himself against the action." *United States v. Lemos*, 2010 WL 1192095, at *2 (S.D.N.Y. Mar. 26, 2010) (citations omitted). Here, there is no serious doubt that the Thruway Authority is charging more in tolls than it needs for the roads and is diverting the excess—more than $100 million each year—to other, non-Thruway uses. Indeed, the Thruway Authority conceded as much in the court below, and its audited financial statements—which are judicially noticeable public records—conclusively establish those facts (*see* JA17–20 ¶¶ 79–103 (citing N.Y. STATE THRUWAY AUTH., AUDITED FINANCIAL STATEMENTS: DEC. 31, 2012 & 2011 (2013); N.Y. STATE THRUWAY AUTH., AUDITED FINANCIAL STATEMENTS: DEC. 31,

2011 & 2010 (2012); N.Y. State Thruway Auth., Audited Financial Statements: Dec. 31, 2010 & 2009 (2011)). The only disputed issue on the merits is the legal question of the proper application of the Commerce Clause and this Court's decision in *Bridgeport* to those facts. Accordingly, there can be no valid concern that evidence has become stale or that the passage of time has impaired the Thruway Authority's ability to defend itself.[9]

---

[9] In the court below, the Thruway Authority offered a litany of speculative harms associated with the payment of money damages: Paying a judgment might be expensive, potentially taking away resources that the Thruway Authority would otherwise use to pay its bond creditors, thus risking the possibility of a downgrade in the Thruway Authority's credit rating and increased costs when the Thruway Authority seeks to borrow money in the future. But again, money damages are legal remedies, to which the doctrine of laches is inapplicable as a matter of law. S*ee Ivani Contracting Corp.*, 103 F.3d at 260. And having to alter one's future conduct to pay a judgment does not constitute prejudice. *See Mahmood v. Research in Motion Ltd.*, 2012 WL 242836, at *8 (S.D.N.Y. Jan. 24, 2012) ("The law is clear that merely asserting that damages would be incurred upon a finding of liability is insufficient to support economic prejudice for purposes of laches."). If it were, "prejudice would then arise in every suit." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992).

Moreover, whatever sums the Thruway Authority may have spent, committed to spend, or borrowed in order to spend on the roads, bridges, employees, or administration of the ***Thruway*** are irrelevant to the prejudice analysis because ATA is not contesting tolls that support the Thruway itself. To be sure, funds collected for purposes other than the roads are at issue; but there is no legal support for the proposition that the doctrine of laches should apply just because the defendant happens to have already spent (or planned to spend) its ill-gotten gains. *Cf. La Parr v. City of Rockford*, 100 F.2d 564, 567 (7th Cir. 1938) (city was not "damaged by any delay" and laches was not applicable although city had already spent a portion of the disputed funds, because the "funds were expended for [the city's] corporate purposes").

45

As the Supreme Court has explained, "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella*, 134 S. Ct. at 1973. Its function is "essentially gap-filling." *Id.* at 1974. When there is no gap—because Congress enacted a statute of limitations, as in *Petrella*, or federal law borrows the state statute of limitations, as here—the doctrine has no role to play. The statute of limitations and the separate-accrual or ongoing-violation rule strike the legislatively chosen balance between plaintiffs' right to a remedy and defendants' right to "peace." *See id.* at 1969–70, 1976. ATA is thus entitled to obtain "retrospective relief only three years back from the time of suit," while "[p]rofits made in [prior] years remain the defendant's to keep." *Id.* at 1973.[10]

## CONCLUSION

This Court should vacate the decision below, hold that the action is not time-barred, and remand for litigation of the merits of ATA's claims.

---

[10] Were this Court to determine that the laches question should not be decided in ATA's favor as a matter of law at this time, the Court should remand with instructions that the issue be considered only at the summary-judgment stage or at trial. Application of the doctrine of laches requires courts to decide questions of unreasonable delay, knowledge, and undue prejudice that entail "fact-intensive inquir[ies] into the conduct and background of both parties." *United States v. Portrait of Wally, A Painting By Egon Schiele*, 2002 WL 553532, at *22 (S.D.N.Y. Apr. 12, 2002). For that reason, laches is "an affirmative defense, which is generally not appropriately raised in a motion to dismiss." *Lennon v. Seaman,* 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999).

Respectfully submitted,

                                  /s/ *Richard B. Katskee*

Richard Pianka                      Evan M. Tager
     ATA LITIGATION CENTER         Richard B. Katskee
     950 North Glebe Road           Thomas P. Wolf
     Arlington, VA 22203                MAYER BROWN LLP
     (703) 838-1889                   1999 K Street NW
                                     Washington, DC 20006
                                     (202) 263-3000

*Attorneys for Plaintiffs-Appellants*

Dated: November 13, 2014

47

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for Plaintiffs-Appellants certifies that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 11,632 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

*/s/ Richard B. Katskee*
Richard B. Katskee
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Dated: November 13, 2014

48

## CERTIFICATE OF SERVICE

I hereby certify that that on November 13, 2014, the foregoing brief and joint appendix were filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

<u>/s/ *Richard B. Katskee*</u>
Richard B. Katskee
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

Dated: November 13, 2014

49

# ADDENDUM: CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. CONST. art. I, § 8:

> The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . .

N.Y. CONST. art. X, § 5:

> § 5. [Public corporations; restrictions on creation and powers; accounts; obligations of]
>
> No public corporation (other than a county, city, town, village, school district or fire district or an improvement district established in a town or towns) possessing both the power to contract indebtedness and the power to collect rentals, charges, rates or fees for the services or facilities furnished or supplied by it shall hereafter be created except by special act of the legislature.
>
> No such public corporation (other than a county or city) shall hereafter be given both the power to contract indebtedness and the power, within any city, to collect rentals, charges, rates or fees from the owners of real estate, or the occupants of real estate (other than the occupants of premises owned or controlled by such corporation or by the state or any civil division thereof), for services or facilities furnished or supplied in connection with such real estate, if such services or facilities are of a character or nature then or formerly furnished or supplied by the city, unless the electors of the city shall approve the granting to such corporation of such powers by a majority vote at a general or special election in such city; but this paragraph shall not apply to a corporation created pursuant to an interstate compact.
>
> The accounts of every such public corporation heretofore or hereafter created shall be subject to the supervision of the state comptroller, or, if the member or members of such public corporation are

appointed by the mayor of a city, to the supervision of the comptroller of such city; provided, however, that this provision shall not apply to such a public corporation created pursuant to agreement or compact with another state or with a foreign power, except with the consent of the parties to such agreement or compact.

Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof; but the state or a political subdivision thereof may, if authorized by the legislature, acquire the properties of any such corporation and pay the indebtedness thereof.

N.Y. Const. art. XV:

§ 1. [Disposition of canals and canal properties prohibited] The legislature shall not sell, abandon or otherwise dispose of the now existing or future improved barge canal, the divisions of which are the Erie canal, the Oswego canal, the Champlain canal, and the Cayuga and Seneca canals, or of the terminals constructed as part of the barge canal system; nor shall it sell, abandon or otherwise dispose of any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system; but such canals and terminals shall remain the property of the state and under its management and control forever. This prohibition shall not prevent the legislature, by appropriate laws, from authorizing the granting of revocable permits or leases for periods of time as authorized by the legislature for the occupancy or use of such lands or structures.

§ 2. [Prohibition inapplicable to lands and properties no longer useful; disposition authorized]

The prohibition of sale, abandonment or other disposition contained in section 1 of this article shall not apply to barge canal lands, barge canal terminals or barge canal terminal lands which have or may become no longer necessary or useful for canal or terminal purposes; nor to any canal lands and appertaining structures constituting the canal system prior to the barge canal improvement which have or may become no longer necessary or useful in conjunction with the now existing barge canal. The legislature may by appropriate legislation authorize the sale, exchange, abandonment or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures which have or may become no longer necessary or useful as a part of the barge canal system, as an aid to navigation thereon, or for barge canal terminal purposes.

§ 3. [Contracts for work and materials; special revenue fund] All boats navigating the canals and the owners and masters thereof, shall be subject to such laws and regulations as have been or may hereafter be enacted concerning the navigation of the canals. The legislature shall annually make provision for the expenses of the superintendence and repairs of the canals, and may provide for the improvement of the canals in such manner as shall be provided by law notwithstanding the creation of a special revenue fund as provided in this section. All contracts for work or materials on any canal shall be made with the persons who shall offer to do or provide the same at the lowest responsible price, with adequate security for their performance as provided by law.

All funds that may be derived from any sale or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures and any other funds collected for the use of the canals or canal lands shall be paid into a special revenue fund of the treasury. Such funds shall only be

expended for the maintenance, construction, reconstruction, development or promotion of the canal, canal lands, or lands adjacent to the canal as provided by law.

\*     \*     \*

N.Y. CANAL LAW:

§ 2. Definitions

The following terms when used in this chapter, unless otherwise expressly stated or unless the context or subject matter requires otherwise, shall have the following meanings:

1. "New York State Canal System", "Canal System" or "Barge Canal System" shall each mean all the canals, canal lands, feeder canals, reservoirs, canal terminals and canal terminal lands of the state as hereinafter defined. All general references herein to "canal" shall be deemed to mean the New York state canal system.

2. "Canals" shall mean the channel and adjacent state-owned banks of the inland waterways of the state constructed, improved, or designated by authority of the legislature as canals and shall include canalized rivers and lakes, canal water supply reservoirs, canal water supply feeder channels and all appertaining structures necessary for the proper maintenance and operation of the canals.

\*     \*     \*

8. "Canal Lands" shall mean all lands and waters forming a part of the canal system title to which was originally vested in the state, acquired by the state or which may in the future be acquired by the state for canal purposes.

\*     \*     \*

§ 5. Transfer of powers and duties relating to canals and canal lands to the New York state thruway authority

The powers and duties of the commissioner of transportation relating to the New York state canal system as set forth in articles one through and including fourteen, except article seven, of this chapter, and except properties in use on the effective date of this article in support of highway maintenance, equipment management and traffic signal operations of the department of transportation, are hereby transferred to and merged with the authority, to be exercised by the authority on behalf of the people of the state of New York. In addition, the commissioner of transportation and the chairman of the authority may, in their discretion, enter into an agreement or agreements transferring the powers and duties of the commissioner of transportation relating to any or all of the bridges and highways as set forth in article seven of this chapter, to be exercised by the authority on behalf of the people of the state of New York, and shall enter into an agreement or agreements for the financing, construction, reconstruction or improvement of lift and movable bridges on the canal system. Such powers shall be in addition to other powers enumerated in title nine of article two of the public authorities law. All of the provisions of title nine of article two of such law which are not inconsistent with this chapter shall apply to the actions and duties of the authority pursuant to this chapter. The authority shall be deemed to be the state in exercising the powers and duties transferred pursuant to this section but for no other purposes.

§ 6. Transfer of canal lands and other assets

1. The jurisdiction of the commissioner of transportation over the New York state canal system and over all state assets, equipment and property, both tangible and intangible, owned or used in connection with the planning, development, construction, reconstruction, maintenance and

operation of the New York state canal system, as set forth in articles one through and including fourteen, except article seven, of this chapter, and except properties in use on the effective date of this article in support of highway maintenance, equipment management and traffic signal operations of the department of transportation are hereby transferred without consideration to the authority, to be held by the authority in the name of the people of the state of New York. In addition the commissioner of transportation and the chairman of the authority may, in their discretion, enter into an agreement or agreements transferring jurisdiction over any or all of the bridges and highways set forth in article seven of this chapter, and any or all state assets, equipment and property, both tangible and intangible, owned or used in connection with the planning, development, construction, reconstruction, maintenance and operation of such bridges and highways, which shall be transferred without consideration to the authority, to be held by the authority through the corporation in the name of the people of the state of New York. Any other rights and obligations resulting from or arising out of the planning, development, construction, reconstruction, operation or maintenance of the New York state canal system shall be deemed assigned to and shall be exercised by the authority through the corporation, except that the authority may designate the commissioner of transportation to be its agent for the operation and maintenance of the New York state canal system, provided that such designation shall have no force or effect after March thirty-first, nineteen hundred ninety-three. Such canal system shall remain the property of the state and under its management and control as exercised by and through the authority, through the corporation which shall be deemed to be the state for the purposes of such management and control of the canals but for no other purposes.

\*     \*     \*

## § 53. Sale of abandoned lands for railroad bridges

Whenever any canal lands, as defined in article one of this chapter, are required in connection with any railroad bridge which has been or which is to be constructed, reconstructed or raised by or for a railroad corporation over that portion of the barge canal, which has been or which will be improved by the use of moneys allotted or to be allotted to the state by the federal government in accordance with chapter six hundred eighty-eight of the laws of nineteen hundred thirty-four, the corporation may issue an official order abandoning the lands for canal purposes. Upon a written request by the railroad corporation, and notwithstanding the provisions of any general or special law, the corporation is authorized to grant and convey such land to said railroad corporation for and on behalf of the people of the state of New York for the purposes mentioned and for a nominal or other consideration and upon such terms and conditions which he shall deem to be beneficial to the state. Such instrument of grant and conveyance shall become effective when it is recorded in the office of the secretary of state. Any moneys realized from the sale of such land shall be deposited into the canal fund.

## § 54. Abandonment and sale of hydropower easements; agreements with hydropower developers

1. Notwithstanding subdivision two of section three or section fifty of the public lands law or section fifty, fifty-one or fifty-two of this article, upon request of a person licensed under Part I of the Federal Power Act (16 U.S.C. § 791a-823a) to develop and operate a hydropower project at a site on the barge canal system, the corporation may adopt an order abandoning a hydropower easement in barge canal system lands and waters which are within the boundaries of such federally licensed project, upon finding the property rights under such easement to be no longer necessary or useful as a part of the barge canal system, as an aid

to navigation thereon, or for barge canal terminal purposes. Upon adoption of such order, and with the approval of the governor, the corporation may sell and convey such easement at private sale to such licensed developer. Such hydropower easements shall be sold for a price to be determined by the corporation taking into consideration the value of obligations to be assumed by such licensed developer, the value of the rights granted to such developer to use canal system lands, waters and facilities for hydropower project purposes and any other appropriate factors.

> \*     \*     \*

N.Y. Pub. Auth Law:

§ 354. Powers of the authority

Except as otherwise limited by this title, the authority shall have power

> 1. To sue and be sued;

> \*     \*     \*

> 7. To make contracts, and to execute all instruments necessary or convenient;

> 8. Subject to agreements with noteholders or bondholders, to fix and collect such fees, rentals and charges for the use of the thruway system or any part thereof necessary or convenient, with an adequate margin of safety, to produce sufficient revenue to meet the expense of maintenance and operation and to fulfill the terms of any agreements made with the holders of its notes or bonds, and to establish the rights and privileges granted upon payment thereof; provided, however, that tolls may only be imposed for the passage through locks and lift bridges by vessels which are propelled in whole or in part by mechanical power; and provided further that no tolls shall be imposed or collected prior to the first day of April, nineteen hundred ninety-three.

\*   \*   \*

12. To borrow money and issue negotiable notes, bonds or other obligations and to provide for the rights of the holders thereof[.]

\*   \*   \*